IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____ )
UNITED STATES OF AMERICA )
and )
THE STATE OF TEXAS, )
)
       Plaintiffs, )
)
v. )      No.
)
VOPAK TERMINAL DEER PARK INC., )
and )
VOPAK LOGISTICS SERVICES USA INC., )
)
       Defendants. )
_____ )

## COMPLAINT

    The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Texas ("Texas"), by and through the Attorney General of Texas, on behalf of the Texas Commission on Environmental Quality ("TCEQ"), file this Complaint and allege as follows:

## NATURE OF ACTION

    1.    This is a civil action against Vopak Terminal Deer Park Inc. and Vopak Logistics Services USA Inc. (collectively "Vopak" or "Defendants"), pursuant to Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b).

    2.    This Complaint seeks civil penalties, injunctive relief, and attorney's fees based on alleged violations at Vopak's waste treatment, recovery and disposal operation (including the

"wastewater treatment system" or "WWTS") and Vopak's bulk liquid chemical storage terminal, both of which are located at or near 2759 Battleground Road (also known as Independence Parkway South) in or around Deer Park, Harris County, Texas (collectively, "the Deer Park Facility" or "Facility").

3.      The Deer Park Facility includes approximately 240 tanks on approximately 189 acres of land.  Each tank's capacity ranges from 1,000 to 80,000 barrels, with a total storage capacity at the Facility of approximately 7 million barrels.  Vopak's tanks provide temporary storage for a variety of chemicals, fuels, oils, and lubricants for Vopak's customers.  The Facility is located directly on the Houston Ship Channel and organic liquids are transferred to and from the Facility by way of truck, rail car, barge, ship, and pipeline.  As part of its operations, Vopak generates wastewater and storm water that contain volatile organic compounds ("VOCs"), which Vopak treats on site at its WWTS.  In addition, four flares at the Facility control emissions associated with the loading process as well as from styrene storage tanks on site.

4.      The claims in this Complaint relate to air emissions associated with the Facility's WWTS, marine-based flares, and chemical storage tanks.

5.      The United States and Texas allege, subject to a reasonable opportunity for further investigation and discovery, that Vopak has violated and/or continues to violate the following statutory and/or regulatory provisions:

> a.      The New Source Performance Standards requirements under Section 111 of the CAA, 42 U.S.C. § 7411, and their implementing regulations, promulgated at 40 C.F.R. Part 60, Subparts A, Ka, and Kb;
>
> b.      The National Emission Standards for Hazardous Air Pollutants requirements under Section 112 of the CAA, 42 U.S.C. § 7412, and their implementing regulations promulgated at 40 C.F.R. Part 63, Subparts A, DD, and EEEE;

      c.      The operating permit requirements of Title V of the CAA, 42 U.S.C. §§ 7661–7661(f), and their implementing regulations promulgated by Texas at 30 Tex. Admin. Code §§ 122.10–122.606; and

      d.      The federally enforceable Texas State Implementation Plan.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).  This Court has personal jurisdiction over Vopak, which does business in the State of Texas and in this judicial district.  Texas invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1367 because its claims are so related to the claims in the United States' action that they form part of the same case or controversy.

7.      Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the alleged violations in this Complaint occurred and/or are occurring at the Facility, which is located in this District.

## NOTICE

8.      Notice of the commencement of this action was provided to Vopak at least 30 days prior to the filing of this Complaint pursuant to Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).  Notice of the commencement of this action was provided to Texas at least 30 days prior to the filing of this Complaint under Sections 113(a)(1) and (b) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (b).

## AUTHORITY

9.      The United States Department of Justice has authority to bring this action on behalf of EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519 and Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

10.      Texas has authority to bring this action on behalf of TCEQ under Chapter 382 of the Texas Health and Safety Code and Sections 7.032, 7.105, and 7.101 of the Texas Water Code.

## DEFENDANTS

11.      Vopak Terminal Deer Park Inc. ("VTDP") is a Delaware corporation and is, and was at all times relevant to this Complaint, the owner and operator of the bulk chemicals storage facility located at the Deer Park Facility.

12.      Vopak Logistics Services USA Inc. ("VLS") is a Delaware corporation and is, and was at all times relevant to this Complaint, the owner and operator of the waste treatment, recovery and disposal operation located at the Deer Park Facility.

13.      VTDP and VLS are each a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e), Section 382.003(10) of the Texas Health and Safety Code, and the applicable federal and state regulations promulgated pursuant to these statutes.

## STATUTORY AND REGULATORY BACKGROUND

## I.      THE CLEAN AIR ACT

14.      The Clean Air Act establishes a regulatory scheme designed "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).

A.      **NATIONAL AMBIENT AIR QUALITY STANDARDS**

1.      **General**

15.      Section 108(a) of the CAA, 42 U.S.C. § 7408(a), directs EPA to identify those air pollutants which "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria for them based on "the latest scientific knowledge" about the effects of the pollutants on public health and the environment.  The pollutants are known as "criteria pollutants."

16.      Section 109(a) of the CAA, 42 U.S.C. § 7409(a), requires EPA to promulgate regulations establishing national ambient air quality standards ("NAAQS") for criteria pollutants. Due to the adverse effects of ground-level ozone on human health and the environment, ground-level ozone is one of the six criteria pollutants for which EPA has promulgated such standards. Ground-level ozone, or "smog," forms at the ground level (unlike stratospheric ozone, which is produced miles above the earth's surface and forms a shield from ultraviolet radiation).  The NAAQS for ozone and other criteria pollutants are set forth in 40 C.F.R. Part 50.

17.      Ozone is not emitted directly from sources of pollution.  Ozone is a photochemical oxidant, formed when certain chemicals in the ambient air react with oxygen in the presence of sunlight.  These chemicals—VOCs and oxides of nitrogen ("NOx")—are called "ozone precursors."  Sources that emit ozone precursors are regulated to reduce ground-level ozone in the ambient air.

18.      Pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those regions within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An air quality control region that meets the NAAQS for a particular pollutant

is deemed an "attainment" area.  A region that does not meet the NAAQS for a particular

pollutant is deemed a "non-attainment" area.  A region that cannot be classified due to

insufficient data is deemed "unclassifiable."  Air quality designations for states are approved by

EPA and can be found at 40 C.F.R. Part 81.

19.     At all times relevant to this Complaint, Deer Park, Texas, located in Harris

County, the county in which the Deer Park Facility is located, has been classified as "non-

attainment" for an applicable ground-level ozone NAAQS.  The specific non-attainment

designation for Harris County has changed over time.  At all times relevant to this Complaint,

and until November, 2015, Harris County was classified as "severe non-attainment" for the 1-

hour ground-level ozone NAAQS.  *See* 73 Fed. Reg. 56983 (Oct. 1, 2008).  On December 14,

2016, EPA reclassified Harris County from "marginal nonattainment" to "moderate

nonattainment" for the 8-hour ground-level ozone NAAQS.  *See* 82 Fed. Reg. 3172 (Dec. 14,

2016).

## 2.     The Texas State Implementation Plan

20.     Section 110(a) of the CAA, 42 U.S.C. § 7410(a), requires each state to adopt and

submit to EPA for approval a plan that provides for the attainment and maintenance of the

NAAQS in each air quality control region within each state.  This plan is known as a State

Implementation Plan ("SIP").

21.     Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, states adopt and submit to

EPA for approval various rules for the attainment and maintenance of the NAAQS.  After such

provisions are approved by EPA, these provisions constitute the SIP, within the meaning of

Sections 113(b) and 302(q) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(q).  These SIPs are

enforceable both by the respective states in which they are adopted and, pursuant to

Section 113(b) of the CAA, 42 U.S.C. § 7413(b), by the United States.

22.     The Texas SIP provisions relevant to this Complaint are specified below.

### 3.     Title 30 of the Texas Administrative Code, Chapter 115

23.     The Texas nonattainment SIP regulations governing the control of air pollution

from VOCs are codified at Title 30 of the Texas Administrative Code ("30 TAC"), Chapter 115.

Of relevance to this Complaint, this Chapter of the Texas SIP contains provisions at Subchapter

B pertaining to Sources of VOCs, including regulations at Division 3, pertaining to Water

Separation, and regulations at Division 4, pertaining to Industrial Wastewater.

24.     The Texas SIP regulations applicable to VOC water separators (i.e., devices that

separate organic or oil-phase material, such as VOCs, from wastewater) at all times relevant to

this Complaint are published at 30 TAC §§ 115.131 through 115.139.  These provisions were

approved by EPA in 2008 as part of the Texas nonattainment SIP rule, 30 TAC, Chapter 115,

Control of Air Pollution from Volatile Organic Compounds, Subchapter B, General Volatile

Organic Compound Sources, Division 3, Water Separation.  73 Fed. Reg. 10,383 (Feb. 27,

2008).

25.     30 TAC § 115.132(a) prohibits all persons in the Houston/Galveston area from

using any "VOC water separator which separates materials containing VOC obtained from any

equipment which is processing, refining, treating, storing, or handling VOC, unless each

compartment is controlled" in one of the following ways:

> (1) "the compartment totally encloses the liquid contents and has all openings
> (such as roof seals and access doors) sealed such that the separator can hold a
> vacuum or pressure without emissions to the atmosphere, except through a
> pressure relief valve.  All gauging and sampling devices shall be vapor-tight
> except during gauging or sampling.  The pressure relief valve must be
> designed to open only as necessary to allow proper operation, and must be set

at the maximum possible pressure necessary for proper operation, but such that the valve will not vent continuously;

(2) the compartment is equipped with a floating roof or internal floating cover which will rest on the surface of the contents and be equipped with a closure seal or seals to close the space between the roof edge and tank wall. All gauging and sampling devices shall be vapor-tight except during gauging or sampling; [or]

(3) the compartment is equipped with a vapor recovery system which satisfies the provisions of §115.131(a) of this title [Title 30 of the Texas Administrative Code]."

26. 30 TAC § 115.137(a)(2) provides an exemption from the control requirements in the preceding paragraph for the use of VOC water separators where the material that is separated does not have a true VOC vapor pressure of 0.5 pounds per square inch absolute ("psia") or greater.

27. The Texas SIP Industrial Wastewater regulations, applicable to owners and operators of specific affected source categories, including the hazardous waste treatment, storage, and disposal facilities industry under Standard Industrial Classification Code 4952, are published at 30 TAC §§ 115.140 through 115.149. These provisions were approved by EPA in 2008 as part of the Texas nonattainment SIP rule, 30 TAC, Chapter 115, Control of Air Pollution from Volatile Organic Compounds, Subchapter B, General Volatile Organic Compound Sources, Division 4, Industrial Wastewater. 73 Fed. Reg. 10,383 (Feb. 27, 2008).

28. Pursuant to 30 TAC § 115.142, for affected sources in the Houston/Galveston area, "[a]ny component of a wastewater storage, handling, transfer, or treatment facility, if the component contains an affected [VOC] wastewater stream, shall be controlled in accordance with either paragraph (1) or (2) of this section [§§ 115.142(1) and 115.142(2)]." The control requirements apply "from the point of generation of an affected VOC wastewater stream until the affected VOC wastewater stream is either returned to a process unit, or is treated to reduce the

VOC content of the wastewater stream by 90% by weight and also reduce the VOC content of the same VOC wastewater stream to less than 1,000 [ppmw]."

29.     30 TAC § 115.142(1)(A) states that "[a]ll components [of a wastewater treatment facility] shall be fully covered or be equipped with water seal controls."

30.     30 TAC § 115.142(1)(B) states that "[a]ll openings [to a component of a wastewater treatment facility] shall be closed and sealed, except when the opening is in actual use for its intended purpose or the component is maintained at a pressure less than atmospheric pressure."

31.     30 TAC § 115.142(1)(C) states that "[a]ll liquid contents [in a component of a wastewater treatment facility] shall be totally enclosed."

### 4.     Title 30 of the Texas Administrative Code, Chapter 116

32.     The Texas SIP regulations governing the control of air pollution by permits for new construction and modification are codified at 30 TAC, Chapter 116.

33.     30 TAC § 116.110 states that "any person who plans to construct any new facility or to engage in the modification of any existing facility which may emit air contaminants into the air" shall obtain a permit authorization before any actual work has started.  This provision was approved by EPA on November 14, 2003 (68 Fed. Reg. 64,543) and was subsequently revised in a manner not relevant to this Complaint and reapproved by EPA on July 14, 2014 (79 Fed. Reg. 40,666).

34.     30 TAC § 116.115(c) states that holders of permits "shall comply with all special conditions contained in the permit document."

35.     30 TAC § 116.116(b)(1) states that, except for qualified facility changes which are not relevant to this Complaint, "the permit holder shall not vary from any representation or permit condition without obtaining a permit amendment if the change will cause:

> (A) a change in the method of control of emissions;
>
> (B) a change in the character of the emissions; or
>
> (C) an increase in the emission rate of any air contaminant."

36.     Both 30 TAC §§ 116.115(b)(2)(G) and 116.615(9) apply to emission sources authorized by permits and state that permitted facilities may not be operated "unless all air pollution emission capture and abatement equipment is maintained in good working order and operating properly during normal facility operations."

37.     30 TAC § 116.115 was approved by EPA on April 2, 2010 (75 Fed. Reg. 16671) and was subsequently revised in a manner not relevant to this Complaint and reapproved by EPA on October 25, 2012 (77 Fed. Reg. 65119).  30 TAC § 116.116 was approved by EPA in 2011. 76 Fed. Reg. 67,600 (Nov. 2, 2011).

**5.     Title 30 of the Texas Administrative Code, Chapter 101**

38.     The Texas SIP regulations setting forth general air quality rules are codified at 30 TAC, Chapter 101.  Of relevance to this Complaint, this Chapter of the Texas SIP contains provisions at Subchapter F, Division 3, pertaining to Operational Requirements, Demonstrations, and Actions to Reduce Excessive Emissions.

39.     Pursuant to 30 TAC § 101.221(a), all pollution "[e]mission capture equipment and abatement equipment must be considered to be in good working order and operated properly when operated in a manner such that each facility is operating within authorized emission limitations."

40.     30 TAC § 101.221 was approved by EPA in 2010.  75 Fed. Reg. 68,989 (Nov. 10, 2010).

**B.      NEW SOURCE PERFORMANCE STANDARDS**

**1.      General**

41.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

42.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS"). Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of a NSPS after the effective date of the NSPS applicable to such source.

43.     "New source" is defined as "any stationary source, the construction or modification of which is commenced after the publication of [the NSPS] regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source."  42 U.S.C. § 7411(a)(2).

44.     "Stationary source" is defined as a "building, structure, facility, or installation which emits or may emit any air pollutant."  42 U.S.C. § 7411(a)(3).

45.     The New Source Performance Standards are located in Part 60 of Title 40 of the Code of Federal Regulations.

46.     30 TAC § 101.20(1) states that any person owning or operating a source of air contaminants must comply with any applicable NSPS promulgated by EPA pursuant to Section 111 of the CAA.

### 2.     Part 60, Subpart A:  General

47.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A ("Part 60, Subpart A").

48.     Under Part 60, Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

49.     "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

### 3.     Part 60, Subpart A:  40 C.F.R. § 60.11(d)

50.     Within Part 60, Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, "at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions."  40 C.F.R. § 60.11(d).

### 4.      Part 60, Subparts Ka and Kb

51.      Within Part 60, Subpart Ka, EPA promulgated specific regulations that apply to each storage vessel for petroleum liquids that has a storage capacity greater than 40,000 gallons and for which construction was commenced after May 18, 1978.  40 C.F.R. § 60.110a(a).

52.      EPA also promulgated specific regulations at 40 C.F.R. § 60.110b(a), Subpart Kb, that apply to each storage vessel with a capacity greater than or equal to 75 cubic meters that is used to store volatile organic liquids and for which construction, reconstruction, or modification was commenced after July 23, 1984.

### C.      NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS

### 1.      General:  Section 112

53.      Through the Clean Air Act Amendments of 1990, Congress established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects, 42 U.S.C. § 7412(b)(1), and directed EPA to publish a list of all "categories and subcategories" of "major sources" of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412(c).

54.      "Major source" is defined as any "stationary source" or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit, considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

55.      A "stationary source" is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3).

56.      Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of major sources of HAPs.  42 U.S.C. § 7412(d)(1).  These emission standards must require the maximum degree of reduction in emissions of HAPs that the

Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

57.     The emission standards promulgated under Section 112 of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories, which include "MACT" ("maximum achievable control technology") standards.  These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

58.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

59.     Pursuant to 30 TAC § 101.20(2), any person owning or operating a source of air contaminants must comply with any applicable emissions standards for hazardous air pollutants promulgated by EPA pursuant to Section 112 of the CAA.

### 2.     Part 63, Subpart A:  General

60.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated regulations that contain general provisions applicable to sources that are subject to the standards of Part 63 of Title 40 of the Code of Federal Regulations.  40 C.F.R. Part 63, Subpart A ("Part 63, Subpart A").

61.     Under Part 63, Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) [e]mits or has the potential to emit any hazardous air pollutant listed in or pursuant to Section 112(b) of the Act [CAA]; and (ii) is subject to any

standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part."  40 C.F.R. § 63.1(b).

62.    Within Part 63, Subpart A, EPA promulgated a requirement that corresponds to the "good air pollution control practices" requirement of Subpart A of the NSPS (*i.e.* 40 C.F.R. § 60.11(d)).  Specifically, "[a]t all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions."  40 C.F.R. § 63.6(e)(1)(i).

### 3.    Part 63 Subpart DD: Off-Site Waste and Recovery Operations

63.    Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the NESHAP for Source Categories for Off-Site Waste and Recovery Operations.  These standards are codified at 40 C.F.R. §§ 63.680 through 63.698.

64.    40 C.F.R. § 63.680(a) states that Subpart DD of 40 C.F.R. Part 63 applies to the owner and operator of a plant site that is a major source of HAPs as defined in 40 C.F.R. § 63.2, and is regulated as a hazardous waste treatment, storage, disposal, recycling, or re-processing operation under 40 C.F.R. Part 264 or 265, if the waste management operations receive off-site materials (e.g., waste) containing one or more HAPs listed in Table 1 of 40 C.F.R. Part 63, Subpart DD.

65.    Pursuant to 40 C.F.R. § 63.683(b)(l), various materials management requirements apply to operations that are subject to Subpart DD including, of relevance to this Complaint, the requirements at 40 C.F.R. § 63.685 that apply to, *inter alia*, tanks and oil-water and organic-water separators.

66.     Exemptions from these and other requirements exist where the total annual quantity of HAPs in the off-site material placed in material management units, or received at the plant site, is less than 1 megagram per year.  *See* 40 C.F.R. §§ 63.683(b)(2)(ii) and 63.680(d) respectively.

67.     40 C.F.R. § 63.685 specifies acceptable controls for tanks depending on the tank's design capacity, maximum vapor pressure of HAPs, and whether the tank is at an existing or new affected source under 40 C.F.R. Subpart DD.  The least stringent tank control level (Level 1) is applicable for smaller tanks and tanks that store materials with lower maximum vapor pressures for HAPs. Such tanks must either have a closed-vent system that is vented to a control device, a floating roof, or must utilize a fixed roof without visible cracks, holes, gaps, or other open spaces between roof section joints or between the interface of the roof edge and the tank wall.  All fixed roof tank openings must remain closed, except in certain specified circumstances.

68.     40 C.F.R. § 63.686 specifies acceptable controls for oil-water separators and organic-water separators, which include equipping separators with floating roofs, equipping separators with closed vent systems connected to a control device, or completely enclosing the separator.

69.     30 TAC § 113.350 states that the Off-Site Waste and Recovery Operations MACT standard as specified in 40 C.F.R. Part 63, Subpart DD, as amended through March 18, 2015, is incorporated by reference.

### 4.     Part 63, Subpart EEEE: Organic Liquids Distribution (Non-Gasoline)

70.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the NESHAP for Source Categories for Organic Liquids Distribution (Non-Gasoline) ("OLD"). These standards are codified at 40 C.F.R. §§ 63.2330 through 63.2406.

71.     40 C.F.R. § 63.2334 states that owners and operators of an OLD operation that is located at, or is part of, a major source of HAPs, is subject to the requirements of 40 C.F.R. 63, Subpart EEEE, with certain exceptions not relevant here.  40 C.F.R. § 63.2338(a) further states that Subpart EEEE is applicable to new, reconstructed, or existing OLD operations.

72.     40 C.F.R. § 63.2350(a) requires compliance with the emission limitations, operating limits, and work practice standards of Subpart EEEE at all times when subject equipment is in OLD operation.

73.     40 C.F.R. § 63.2350(b) requires affected sources under Subpart EEEE, including air pollution control and monitoring equipment, to be operated and maintained according to the provisions in Section 63.6(e)(1)(i) of Subpart A.

74.     40 C.F.R. § 63.2378(b) states that affected sources must follow the "requirements in § 63.6(e)(1) and (3) during periods of startup, shutdown, malfunction, or nonoperation of the affected source or any part thereof."  This provision further requires that reasonable measures to prevent or minimize excess emissions must be implemented during startup, shutdown, or malfunction.  40 C.F.R. § 63.2378(b)(3).

75.     30 TAC § 113.880 states that the OLD MACT standard, as specified in 40 C.F.R. Part 63, Subpart EEEE, as amended through December 22, 2008, is incorporated by reference.

**D.     <u>TITLE V</u>**

76.     Title V of the CAA, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources and sources subject to, *inter alia*, Sections 111 (NSPS program) or 112 (NESHAP/MACT program) of the CAA.  42 U.S.C. § 7661a(a). The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

17

77.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. These regulations are codified at 40 C.F.R. Part 70.

78.     Texas is authorized to issue and enforce Title V permits.  30 TAC, Chapter 122 (approved at 66 Fed. Reg. 63,318 (Dec. 6, 2001)).  In all respects relevant to this Complaint, the Title V regulations of Texas closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

79.     Pursuant to Section 382.054 of the Texas Health and Safety Code, a person may not operate a federal source unless the person has obtained a federal operating permit from TCEQ under Sections 382.0541, 382.0542, or 382.0543.

80.     Pursuant to Section 382.085(b) of the Texas Health and Safety Code, no person may cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity in violation of Chapter 382 of the Texas Health and Safety Code or of any TCEQ rule or order.

81.     Pursuant to 30 TAC § 122.10(13), a "major source" is any site that emits or has the potential to emit 25 tons per year ("tpy") or more of VOCs in areas designated as "severe" nonattainment for ozone, or 100 tpy in areas designated as "marginal" or "moderate" nonattainment for ozone; and for pollutants other than radionuclides, any site that emits or has the potential to emit, in the aggregate, 10 tpy or more of any single HAP or 25 tpy or more of any combination of HAPs.

82.     Under Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1), a "major source" includes any site that emits or has the potential to emit, 10 tpy or more of any single HAP listed

under Section 112(b) of the CAA, 42 U.S.C. § 7412(b), or 25 tpy or more of any combination of HAPs listed under Section 112(b) of the CAA, 42 U.S.C. § 7412(b).

83.     Under Section 302(j) of the CAA, 42 U.S.C. § 7602(j), a "major stationary source" is any stationary facility or source that directly emits or has the potential to emit 100 tpy or more of any pollutant.  In areas designated as "severe" nonattainment for ozone, a "major source" is any stationary source or group of sources within a contiguous area and under common control that emits or has the potential to emit 25 tpy of VOCs.  Section 182(d) of the CAA, 42 U.S.C. § 7511a(d).

84.     Under 30 TAC § 122.10(27), "site" is "[t]he total of all stationary sources located on one or more contiguous or adjacent properties, which are under common control of the same person (or persons under common control)."  *See also* 42 U.S.C. § 7661(2).

85.     Pursuant to 30 TAC § 122.120(a)(1), an owner or operator of any site that is a "major source" according to the definitions of 30 TAC § 122.10 is subject to the permit requirements of 30 TAC, Chapter 122, pertaining to Title V Permits.

86.     Pursuant to Section 503(c) of the CAA, 42 U.S.C. § 7661b(c), the implementing regulations at 40 C.F.R. § 70.5(a), and 30 TAC, Chapter 122, each owner and operator of a source subject to Title V permitting requirements must submit a timely, accurate, and complete application for a permit, including information required to be submitted with the application. 30 TAC §§ 122.130 through 122.134 require timely and complete permit applications for Title V permits and 30 TAC §§ 122.142 through 122.148 specify the required permit content.

87.     Pursuant to Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), the implementing regulations at 40 C.F.R. § 70.6(a)(6)(i) and 30 TAC § 122.143(4), after the effective date of the state Title V permit program, no person may violate any requirement of a Title V permit.

Moreover, pursuant to 30 TAC § 122.143(4), holders of Title V permits "shall comply with all terms and conditions codified in the permit and any provisional terms and conditions required to be included with the permit."  30 TAC § 122.121 states that owners and operators of sites identified in 30 TAC § 122.120 "shall not operate emission units at those sites" without a Title V permit issued or granted under 30 TAC, Chapter 122.

88.     All terms and conditions of a Title V permit are enforceable by EPA.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

### E.     ENFORCEMENT OF THE CAA BY THE UNITED STATES

89.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, a state-issued operating permit, the NSPS program, the NESHAP/MACT program, the Title V permit program, or a Title V permit.

90.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

91.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017).

### F.  ENFORCEMENT OF THE TEXAS CLEAN AIR ACT BY THE STATE OF TEXAS

92.     Sections 7.032 and 7.105 of the Texas Water Code, authorize the Attorney General of Texas, at the request of TCEQ, to bring an action for injunctive relief and/or civil penalties if it appears that a violation or threat of a violation of a statute within TCEQ jurisdiction, or a rule adopted or an order or a permit issued under such a statute, has occurred or is about to occur.

93.     Section 7.101 of the Texas Water Code states that no person may cause, suffer, allow, or permit any violation of a statute within TCEQ jurisdiction or a rule adopted or an order or permit issued under such a statute.

94.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

95.     Pursuant to Section 7.108 of the Texas Water Code, Vopak is liable for Texas's reasonable attorney's fees, court costs, and reasonable investigative costs.

## CLAIMS FOR RELIEF

### 1.  General Allegations

96.     The Deer Park Facility is located in Harris County, Texas, in the Houston/Galveston area.  The Facility includes a bulk liquid chemical storage terminal ("chemical storage terminal"), including marine and land-based flares that are used as emission control devices, and a waste treatment, recovery and disposal operation.  This waste treatment,

recovery and disposal operation includes a deep well injection waste disposal system ("DWS") and a WWTS.  The WWTS includes a biological treatment unit.

97.     VTDP is the "owner or operator," within the meaning of the CAA, of the chemical storage terminal at the Facility.

98.     VLS is the "owner or operator," within the meaning of the CAA, of the waste treatment, recovery and disposal operation (including the DWS and the WWTS) at the Facility.

99.     EPA conducted inspections of the Facility on October 15–19, 2012, on November 18–21, 2014, and on July 27–31, 2015.

**2.   General Allegations Related to the Chemical Storage Terminal**

100.     The chemical storage tank terminal at the Facility includes a building, structure, facility, or installation that emits or may emit an air pollutant.  The chemical storage terminal is therefore a "stationary source," as defined in Section 112(a)(3) of the CAA, 42 U.S.C. § 7412(a)(3) and 40 C.F.R. § 63.2.

101.     On December 31, 2004, Texas issued Air Permit 466A to VTDP to authorize emissions from the chemical storage terminal.  This permit has been amended several times, most recently in February of 2017.  On April 13, 2009, Texas issued Title V Operating Permit O1068 to VTDP to authorize the operation of the chemical storage terminal.  Permit O1068 indicates that 30 TAC §§ 101.221, 116.115, and 116.615 are applicable requirements for the marine flares, that 40 C.F.R. § 60.11 is an applicable requirement for certain chemical storage terminal tanks, that 40 C.F.R. § 63.6 is an applicable requirement for the chemical storage terminal tanks, and that 40 C.F.R. § 63.2378 is an applicable requirement for the chemical storage terminal.

102. Permit 466A states that the chemical storage terminal has the potential to emit VOCs in excess of 100 tpy, indicating that the chemical storage terminal exceeded the applicable major source thresholds for stationary sources in Houston/Galveston ozone nonattainment area at all times relevant to this Complaint.  The chemical storage terminal emits or has the potential to emit 10 tpy or more of any single HAP and 25 tpy or more of any combination of  HAPs. Therefore, the chemical storage terminal is a major stationary source under of Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1).

103. At all times relevant to this Complaint, VTDP operated four flares at the chemical storage terminal: two marine and two land-based.

### 3. General Allegations Related to the Wastewater Treatment System

104. The WWTS includes a building, structure, facility, or installation that emits or may emit an air pollutant.  The WWTS is therefore a "stationary source," as defined at 42 U.S.C. § 7412(a)(3) and 40 C.F.R. § 63.2.

105. The WWTS is (or was at times relevant to this Complaint) comprised of more than 20 tanks and other "facilities and functions," including Tanks 569, 570, and 571, a biological treatment unit, and a Dissolved Air Floatation ("DAF") unit.

106. The process of treating wastewater that contains VOCs in the WWTS includes, among other things, the process of separating VOCs from water.  VOCs naturally range from insoluble to slightly soluble in water and, when contained in wastewater, VOCs tend to "phase-separate" into organic or oil-phase material (i.e., the VOCs) and aqueous phases.  VOC water separators separate organic material from the aqueous phase of the wastewater.

107. The organic or oil-phase material separated by a VOC water separator typically has a lower density than the aqueous phase of the wastewater, causing the organic or oil-phase

material to coalesce and float on the surface of the wastewater. The floating organic or oil-phase material has a high surface-to-volume ratio that enhances evaporation and VOC emissions. The vapor pressure of the VOC in the organic or oil-phase material is a measure of its propensity to volatilize or evaporate, and higher vapor pressure VOCs typically volatilize more quickly than lower vapor pressure VOCs.

108.   On July 13, 2010, Texas issued Air Permit Number 87923 to VLS to authorize both the operation of the units necessary to treat and dispose of wastewater and, subject to a maximum allowable emissions rate table, certain air emissions from the WWTS and the DWS. VLS submitted the initial application to Texas in two parts on March 31, 2009, and April 6, 2009 (hereinafter, "Permit 87923 Application"), and made the following representations in its applications:

a.   That certain listed specific equipment will be utilized for receiving and processing material as part of the WWTS and DWS.

b.   That the WWTS is a hazardous waste treatment, storage, and disposal facility industry under Standard Industrial Classification Code 4952 and is subject to the rules set forth under 30 TAC, Chapter 115, Subchapter B, Division 4: Industrial Wastewater.

c.   That the "[c]ontrols in [p]lace" for the WWTS include a "[p]iped/covered conveyance to biological treatment," with uncontrolled VOC emissions estimated to be 5.41 tpy.

d.   That WWTS controls are required under "30 TAC 115, Subchapter B, Division 4: Industrial Wastewater," "except for properly operated biotreatment units meeting 30 TAC § 115.142(3) requirements," suggesting that the WWTS components will be fully covered and controlled, up to the aeration basin where biological treatment occurs.

e.   That no organic or oil phase material will enter the WWTS, except for the API Separator, which will function to separate organic or oil phase materials from aqueous phase materials, and divert the organic or oil phase material away from the WWTS.

f.   That the only WWTS components that will be aerated are the 01-C-5 DAF and the 01-T-56 Aeration Basin.

g.   That certain listed specific compounds and their maximum concentrations will be contained in the streams that flow into the DWS and the WWTS.

109.   At all times relevant to this Complaint, Permit 87923 authorized operation of the WWTS for wastewater treatment and the DWS for waste disposal.

110.   Pursuant to 30 TAC § 116.115(c), Vopak is required to comply with all special conditions contained in Permit 87923.

111.   Special Condition 1 of Permit 87923 sets forth the applicable Maximum Allowable Emission Rates for emissions from the WWTS.

112.   Special Condition 14 of Permit 87923, as revised on May 3, 2011, states that the WWTS "shall consist" of the 22 specifically identified "facilities and functions."

113.   Special Condition 18 of Permit 87923 states that the DWS "shall consist" of the 24 specifically identified facilities.

114.   Special Condition 23 of Permit 87923 requires that the emissions from the WWTS and the DWS be estimated on the basis of influent wastewater samples that shall be collected quarterly to determine the concentrations of chemicals listed in the permit.  If the samples indicate the presence of a new air contaminant, specified calculations must be performed and documented regarding that new contaminant.

115.   Subject to a reasonable opportunity for further investigation and discovery, the Facility (a) is a major source of HAPs, as defined in 40 C.F.R. § 63.2; (b) is regulated as a hazardous waste treatment, storage, disposal, recycling, or reprocessing operation under 40 C.F.R. Part 264 or 265; and (c) historically received, and may continue to receive, off-site

materials (as defined in 40 C.F.R. § 63.681) that contain one or more of the HAPs listed in Table 1 of 40 C.F.R. Part 63, Subpart DD, for treatment, storage, disposal, recycling, or re-processing.

### CLAIM 1: Failure to Comply with Emissions Limits at the WWTS

116.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

117.    Special Condition 1 of Permit 87923 authorizes emissions from specified emission units, subject to Maximum Allowable Emission Rates "and other operating requirements specified in the special conditions."

118.    Special Condition 23 requires that emissions from the WWTS be estimated using quarterly influent wastewater sample results for the listed compounds and for tentatively identified new air contaminants that can be confirmed as present.

119.    The Maximum Allowable Emission Rates table attached to Permit 87923 provides the following emission rate limits for the WWTS:

| Pollutant | Lbs./hr. | Tons/year |
|-----------|----------|-----------|
| VOC | 19.56 | 6.47 |
| Non-VOC (acetone) | 24.69 | 0.09 |
| Benzene | 0.52 | 0.78 |
| Styrene | 0.25 | 0.39 |

120.    Under Special Condition 1 of Permit 87923, the annual emission limit for acetone at the WWTS is 0.09 tpy.  Subject to a reasonable opportunity for further investigation and discovery, the WWTS emitted at least 0.67 tpy in 2012 and 2013, and at least 0.53 tpy of acetone in 2014, 2015, and 2016.  Vopak violated Special Condition 1 of Permit 87923 and 30 TAC § 116.115(c) by failing to comply with acetone permit emission limits in 2012 through 2016.

121.     Under Special Condition 1 of Permit 87923, the hourly emission limit for benzene at the WWTS is 0.52 lbs./hr. and the annual emission limit is 0.78 tpy.  Subject to a reasonable opportunity for further investigation and discovery, the WWTS emitted at least 1.15 lbs./hr. of benzene in the fourth quarter of 2014, at least 2.14 tpy of benzene in 2012 and 2013, and at least 1.57 tpy of benzene in 2014, 2015, and 2016.  Vopak violated Special Condition 1 of Permit 87923 and 30 TAC § 116.115(c) by failing to comply with benzene permit emission limits in 2012 through 2016.

122.     Under Special Condition 1 of Permit 87923, the annual emission limit for styrene at the WWTS is 0.39 tpy and the hourly emission limit is 0.25 lbs./hr.  Subject to a reasonable opportunity for further investigation and discovery, the WWTS emitted at least 0.45 lbs./hr. of styrene in the fourth quarter of 2014, at least 1.0 tpy of styrene in 2012 and 2013, and at least 0.81 tpy of styrene in 2014, 2015, and 2016.  Vopak violated Special Condition 1 of Permit 87923 and 30 TAC § 116.115(c) by failing to comply with styrene permit emission limits in 2012 through 2016.

123.     Under Special Condition 1 of Permit 87923, the annual emission limit for VOC at the WWTS is 6.47 tpy.  Subject to a reasonable opportunity for further investigation and discovery, the WWTS emitted at least 7.86 tpy of VOC in 2012 and 2013, and at least 9.55 tpy of VOC in 2014.  Vopak violated Special Condition 1 to Permit 87923 and 30 TAC § 116.115(c) by failing to comply with the VOC permit emission limit in 2012 through 2014.

124.     Unless restrained by an Order of this Court, these violations may continue.

125.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after

November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

126.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

## **CLAIM 2: Failure to Control or Cover VOC Water Separators**

127.     Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

128.     In October of 2012, EPA inspectors observed Tanks 569, 570, and 571 as well as an open-top DAF unit (i.e., 01-C-5-DAF, hereinafter "the old DAF") without covers, open to the atmosphere (hereinafter "open-top"), and in use as VOC water separators at the WWTS.

129.     In November of 2014, EPA inspectors observed open-top Tanks 570 and 571, and a new open-top DAF unit (hereinafter, "new DAF") in use as VOC water separators at the WWTS.  EPA inspectors also observed that Tank 569 had been disconnected and removed from service, and that the old DAF had been completely removed from the WWTS area.

130.     In July of 2015, EPA inspectors observed open-top Tanks 570 and 571, and a new open-top DAF in use as VOC water separators at the WWTS.

131.     During each of these three inspections, EPA inspectors observed (a) separated organic or oil-phase materials floating on top of the liquid stored inside these open-top DAFs and tanks; and (b) that the DAF in service was equipped with a skimmer system that skimmed organic or oil-phase material produced by the DAF process into a separate conveyance of the WWTS, thereby separating VOCs from wastewater.

132.    EPA and Vopak collected air samples from above the old DAF on October 16, 2012, and October 19, 2012, and from above the new DAF on November 20, 2014.  Subject to a reasonable opportunity for further investigation and discovery, Vopak collected liquid samples on a variety of dates, beginning on or around April 5, 2011, from the effluent streams of Tanks 569, 570, and 571.  EPA and Vopak collected liquid samples from Tank 571 and the new DAF on July 27-28, 2015.  On August 8 and August 25, 2014, Vopak collected liquid samples from the organic or oil-phase material floating on the surface of the wastewater in Tanks 570 and 571.

133.    The analytical results of these samples indicate that the separated organic or oil-phase material included the compounds methyl tert-butyl ether ("MTBE"), benzene, methyl ethyl ketone ("MEK"), toluene, methyl isobutyl ketone ("MIK"), ethyl tert-butyl ether ("ETBE"), 1,3-butadiene, acrylonitrile, carbon disulfide, hexane, and heptane.  Each of these compounds is a VOC that will phase-separate to create an organic or oil-phase material floating on the surface of wastewater.  Each of these compounds has a true vapor pressure of VOC that exceeds 0.5 psia.

134.    The use of VOC water separators to separate materials having a true vapor pressure of VOC greater than 0.5 psia is subject to the control requirements in 30 TAC § 115.132(a) by 30 TAC § 115.137(a)(2).

135.    The analyses of samples collected by Vopak and EPA, together with observations by EPA inspectors in October of 2012, November of 2015, and July of 2015, indicate that Vopak used Tanks 569, 570, and 571, the old DAF, and the new DAF as VOC water separators.

136.    During the 2012 inspection, EPA inspectors observed that Tanks 569, 570, 571, and the old DAF did not include the controls required by 30 TAC § 115.132(a).  During the 2014 and 2015 inspections, EPA inspectors observed that Tanks 570, 571, and the new DAF did not include the controls required by 30 TAC § 115.132(a).  In each case, the tanks and DAFs were

open to the atmosphere, were not totally enclosed, had openings that were not sealed, and were not equipped with emissions controls such as a floating roof, internal floating cover, or a vapor recovery system.

137.    Vopak violated 30 TAC § 115.132(a) by failing to control emissions from, or totally enclose, Tanks 569, 570, 571, the old DAF, and the new DAF, all of which were being used as VOC water separators for materials having a true vapor pressure of VOC greater than 0.5 psia.  Subject to a reasonable opportunity for further investigation and discovery, Vopak has since taken Tank 569 and the old DAF out of service.  However, Vopak may continue to violate 30 TAC § 115.132(a) at the fixed-roof receipt tanks that replaced Tank 569, the new DAF, and Tanks 570 and 571 unless restrained by an Order of this Court.

138.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

139.    Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

**CLAIM 3: Failure to Comply With Special Conditions 14 and 18 of Permit 87923 Regarding Equipment Operation**

140.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

**Failure to Comply with Special Conditions 14 and 18 Regarding the Operation of Required Equipment at the WWTS**

141.     Under Special Condition 14 of Permit 87923, Vopak is required to include the centrifuge and its feed Tank 43 and receipt Tank 44 as part of the WWTS.  Under Special Condition 18 of Permit 87923, Vopak is required to include the centrifuge and its feed Tank 43 and receipt Tank 44 as part of the DWS.

142.     During the October 2012, November 2014, and July 2015 inspections, EPA inspectors observed that the centrifuge and its feed Tank 43 and receipt Tank 44 had been taken out of service.

143.     The function of the centrifuge and its feed and receipt tanks was to provide an enclosed system so that the centrifuge could be used as a VOC water separator to separate organic or oil phase materials having a true vapor pressure of VOC greater than 0.5 psia, as required by 30 TAC § 115.132(a).

144.     The centrifuge and its feed Tank 43 and receipt Tank 44 are specifically identified facilities and functions listed in Permit 87923, and are required to be included as part of the WWTS by Special Condition 14 of Permit 87923.  These facilities and functions are components of the WWTS operation and method of emissions control.

145.     The centrifuge and its feed Tank 43 and receipt Tank 44 are specifically identified facilities listed in Permit 87923, and are required to be included as part of the DWS by Special Condition 18 of Permit 87923.  These facilities are components of the DWS operation and method of emissions control.

146.     Vopak violated Special Conditions 14 and 18 of Permit 87923 and 30 TAC § 116.115(c) by taking the centrifuge and its feed Tank 43 and receipt Tank 44 out of service.

**Failure to Comply with Special Condition 14 Regarding the Operation of Unpermitted Equipment at the WWTS**

147.     Under Special Condition 14 of Permit 87923, the WWTS "shall consist" of 22 specifically identified "facilities and functions." Special Condition 14 of Permit 87923 does not state that the WWTS operations include a Flocculation Basin or a DAF Sump.

148.     During the October 2012, November 2014, and July 2015 inspections, EPA inspectors observed that an open-top Flocculation Basin and an open-top DAF Sump were emission sources in use as part of the WWTS operations.

149.     Subject to a reasonable opportunity for further investigation and discovery, Vopak has not applied for or been granted permit authorization for operation of the Flocculation Basin and DAF Sump.

150.     Vopak violated Special Condition 14 of Permit 87923 and 30 TAC §§ 116.115(c) and 116.110(a) by operating the Flocculation Basin and DAF Sump as part of the WWTS.

151.     Unless restrained by an Order of this Court, the violations in Paragraphs 146 and 150 may continue.

152.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

153.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

## CLAIM 4: Failure to Comply With Special Condition 23 of Permit 87923 Regarding Quarterly Sampling

154.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

155.    Quarterly sampling is required by Special Condition 23 of Permit 87923.

156.    Subject to a reasonable opportunity for further investigation and discovery, from July 11, 2011 to April 8, 2013, a period that includes eight calendar quarters, Vopak conducted the required sampling and analysis five times.

157.    Vopak failed to comply with Special Condition 23 of Permit 87923 and with 30 TAC § 116.115(c) on at least 3 occasions.

158.    Unless restrained by an Order of this Court, this violation may continue.

159.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

160.    Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

## CLAIM 5: Unlawful Variance from Permit Representations

161.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

162.    On March 31, 2009, Vopak submitted its Permit 87923 Application, and subsequently submitted amendments to the application, to seek authorization for the WWTS.  In this application, Vopak made representations regarding the WWTS construction and operation.

163.     Pursuant to 30 TAC § 116.116(b)(1), a permit holder must receive a permit amendment prior to varying from any permit representation if the change will cause a change in the method of control of emissions; a change in the character of the emissions; or an increase in the emission rate of any air contaminant.

**Failure to Adhere to Permit Application Representations Regarding BACT**

164.     Vopak's Permit 87923 Application states that the emissions controls at the WWTS are consistent with the Best Available Control Technology ("BACT") because (a) the "[c]ontrols in [p]lace" for the WWTS include a "[p]iped/covered conveyance to biological treatment," with uncontrolled VOC emissions estimated to be 5.41 tpy; and (b) the WWTS controls required under "30 TAC 115, Subchapter B, Division 4: Industrial Wastewater," are in place "except for properly operated biotreatment units meeting 30 TAC § 115.142(3) requirements," thereby indicating that the WWTS components will be covered and controlled up to the aeration basin where biological treatment occurs.

165.     The controls required under 30 TAC, Chapter 115, Subchapter B, Division 4: Industrial Wastewater include the following:

   a.   Pursuant to 30 TAC § 115.142(1)(A), "[a]ll components [of a wastewater treatment facility] shall be fully covered or be equipped with water seal controls";

   b.   Pursuant to 30 TAC § 115.142(1)(B), "[a]ll openings [to a component of a wastewater treatment facility] shall be closed and sealed, except when the opening is in actual use for its intended purpose or the component is maintained at a pressure less than atmospheric pressure"; and

   c.   Pursuant to 30 TAC § 115.142(1)(C), "[a]ll liquid contents [in a component of a wastewater treatment facility] shall be totally enclosed".

166.     Vopak's Permit 87923 Application states that the only WWTS components that will be aerated are the 01-C-5 DAF, the 01-T-56 Aeration Basin, and the 01-C-9A/B Digester.

167.     Pursuant to "TCEQ Chemical Sources, Historical Best Available Control Technology (BACT) Requirements (1996-2011)," BACT for wastewater facilities (where uncontrolled emissions exceed 5 tpy VOC) consists of routing "stripped gases" (e.g., VOC gases volatilized when wastewater is aerated) generated during pretreatment to a control device, utilizing a collection system that is a "hard piped/covered conveyance to [a] biological treatment unit," and complying with the requirement that "the wastewater treatment system must be at least 90 percent efficient."  Further TCEQ guidance (Texas Commission on Environmental Quality, Air Permits Division, New Source Review (NSR) Boilerplate Special Conditions (August 2011)) states that a "well designed and operated wastewater treatment system should limit air emissions to less than 10% of the initial hydrocarbon in the water entering the plant."

168.     Based on information obtained during the 2012, 2014, and 2015 inspections and a review of historical aerial imagery, at all times relevant to this Complaint, the WWTS included the following: open-top and aerated Tank 569, open-top API Separator, open-top DAF sump, open-top and aerated tanks 01-T-570 and 01-T-571, open-top Flocculation Basin, and open-top DAF, all of which are WWTS components located upstream of the biological treatment unit. These open-top components, some of which were also aerated, were not covered and were therefore inconsistent with TCEQ Guidance defining BACT for this WWTS and with Vopak's representations in its Permit 87923 Application.

169.     These uncovered and uncontrolled (and, in some cases, aerated) components of the WWTS resulted in increased VOC emissions to the atmosphere and varied from the represented method of control.

170.    Subject to a reasonable opportunity for further investigation and discovery, Vopak has not applied for or been granted a permit modification authorizing these variances from Vopak's Permit 87923 Application representations.

171.    Vopak violated 30 TAC § 116.116(b)(1) by varying from permit representations that the WWTS would have BACT-level controls including a "piped/covered conveyance to biological treatment."

**Failure to Adhere to Permit Representations Regarding Organic or Oil-phase Material Entering the WWTS**

172.    Vopak's Permit 87923 Application states that only aqueous phase wastewater (i.e., no organic or oil-phase material) will be stored, handled, processed, or treated in Tanks 570 and 571.

173.    Subject to a reasonable opportunity for further investigation and discovery, during the October 2012, November 2014, and July 2015 inspections, EPA inspectors observed organic or oil-phase material in Tanks 570 and 571.

174.    Subject to a reasonable opportunity for further investigation and discovery, allowing organic or oil-phase material to accumulate in Tanks 570 and 571 increased emissions.

175.    Subject to a reasonable opportunity for further investigation and discovery, Vopak has not been granted a permit modification authorizing a variance from permit application representations for storage, handling, processing, or treating organic or oil-phase material in Tanks 570 and 571.

176.    Vopak violated 30 TAC § 116.116(b)(1) by varying from permit representations without permit authorization for how organic or oil-phase material is stored, handled, processed, or treated in Tanks 570 and 571.

**Failure to Adhere to Permit Representations Regarding Unauthorized Compounds in the Wastewater of the WWTS**

177.     Vopak's Permit 87923 Application provides an exclusive list of compounds to be contained in the wastewater of the WWTS.  This list is incorporated into Permit 87923 at Attachment 1 and is entitled, "Approved Chemical List for Wastewater System and Deepwell System."  This list sets forth the compounds authorized to be in the wastewater of the WWTS.

178.     Subject to a reasonable opportunity for further investigation and discovery, results from liquid samples obtained between 2011 and 2015, and air samples obtained in October of 2012 and November of 2014, indicate that the wastewater of the WWTS included numerous compounds not listed in Vopak's Permit 87923 Application representations or Attachment 1 of Permit 87923.

179.     The presence of these unauthorized compounds in the WWTS resulted in a change in the character of the emissions.

180.     Subject to a reasonable opportunity for further investigation and discovery, Vopak has not been granted a permit amendment authorizing these compounds to be in the wastewater of the WWTS.

181.     Vopak violated 30 TAC § 116.116(b)(1) by varying from permit representations regarding which compounds may be in the wastewater of the WWTS, which caused a change in the character of the emissions.

**Failure to Adhere to Permit Representations Regarding Unauthorized Concentrations of Compounds in the Wastewater of the WWTS**

182.     Vopak's Permit 87923 Application states the maximum concentrations for compounds contained in the wastewater of the WWTS.

183.     Subject to a reasonable opportunity for further investigation and discovery, results from samples collected beginning on or around April 5, 2011, indicate that the wastewater of the WWTS contained concentrations of compounds in excess of the amounts stated in Vopak's Permit 87923 Application.

184.     By exceeding the concentrations stated in the Permit 87923 Application, Vopak has increased emissions from the WWTS.

185.     Subject to a reasonable opportunity for further investigation and discovery, Vopak has not been granted a permit amendment authorizing these increased concentrations.

186.     Vopak violated 30 TAC § 116.116(b)(1) by varying from permit application representations by exceeding represented concentrations of compounds in the wastewater of the WWTS, which caused an increase in air emissions.

187.     Unless restrained by an Order of this Court, each of the violations stated in Paragraphs 171, 176, 181, and 186 may continue.

188.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

189.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

## CLAIM  6: Failure to Include Operating Emissions Units at the Waste Treatment, Recovery and Disposal Operation Area in a Title V Permit

190.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

191.    The Facility is a major source of HAPs and VOCs.

192.    Subject to a reasonable opportunity for further investigation and discovery, the waste treatment, recovery and disposal operation area, owned and operated by VLS, is contiguous, and shares the same physical address, with the chemical storage terminal, owned and operated by VTDP.  Vehicular access to both Vopak's waste treatment, recovery and disposal operation area and the chemical storage terminal is accomplished through the same security access point.

193.    Subject to a reasonable opportunity for further investigation and discovery, Vopak's waste treatment, recovery and disposal operation area and Vopak's chemical storage terminal are under the common control of Vopak North America Inc. d/b/a Vopak Americas. Vopak Americas is the direct parent corporation of VLS and of Vopak Terminals North America Inc ("VTNA").  VTNA is the direct parent corporation of VTDP.

194.    Tank 530, which is authorized by VTDP's Permit 466A, is operated by VLS as part of the WWTS in the waste treatment, recovery and disposal operation area.  Tanks 532, 572, and 573, which are authorized by VLS's Permit 87923, are located on chemical storage tank property, owned by VTDP.

195.    The WWTS and the chemical storage terminal at the Facility comprise a "major source" within the meaning of the CAA, the NSPS program and regulations, the NESHAP/MACT program and regulations, the Title V program and regulations, and the Texas SIP that adopts, incorporates, and/or implements these programs and regulations.

196.     At all times relevant to this Complaint, the emission sources at the waste treatment, recovery and disposal operation area, which are authorized by Permit 87923, were not authorized for operation pursuant to a Title V Federal Operating Permit, as required by 42 U.S.C. §§ 7661a(a) and 7661b(c), 40 C.F.R. § 70.7(b), and 30 TAC § 122.121.

197.     Unless restrained by an Order of this Court, these violations may continue.

198.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

199.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

### CLAIM 7: Failure to Operate Marine Flares in Accordance with Good Air Pollution Control Practices

200.     Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

201.     Vopak's marine flares serve as emission controls by combusting flammable pollutants that are emitted from styrene tanks or when products containing VOCs are being loaded onto ships or barges.

202.     In October of 2012, EPA inspectors observed large emission plumes from the marine flares using optical gas imaging with an infrared camera capable of detecting VOCs and observed that the temperatures at the marine flares were too low for proper combustion.  Subject

to a reasonable opportunity for further investigation and discovery, the marine flares were not maintained in good working order nor operated properly during Facility operations.

203.    Vopak violated 30 TAC §§ 101.221(a), 116.115(b)(2)(G), and 116.615(9) by failing to maintain the marine flares in good working order and by failing to operate the marine flares properly during Facility operations.

204.    The above mentioned violations are also a violation of Vopak's Title V Permit O1068 (see Special Terms and Conditions, Nos. 2H, 15, and 18B), and 30 TAC § 122.143.

205.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

206.    Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

### CLAIM 8: Failure to Comply with Subpart DD – Off-Site Waste

207.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

208.    Subject to a reasonable opportunity for further investigation and discovery, at all times relevant to this Complaint, Vopak received off-site materials, as defined in 40 C.F.R. § 63.681, for storage, treatment, and disposal at the Facility.  The off-site material contains one or more of the HAPs listed in Table 1 of 40 C.F.R. Part 63, Subpart DD.

209.     Texas incorporated the Off-Site Waste and Recovery Operations Maximum Achievable Control Technology standard as specified in 40 C.F.R. Part 63, Subpart DD by reference. 30 TAC § 113.350.

210.     Under 30 TAC § 101.20(2), any person owning or operating a source of air contaminants must comply with any applicable emissions standards for hazardous air pollutants promulgated by EPA pursuant to Section 112 of the CAA.

211.     Subject to a reasonable opportunity for further investigation and discovery, Vopak violated 40 C.F.R. § 63.683(b)(1) and 30 TAC § 101.20(2), by failing to comply with the requirements contained therein regarding the handling and treatment of off-site materials, or to demonstrate that one or more of the exemptions under 40 C.F.R. §§ 63.680(d) or 63.683(b)(2)(ii) are applicable.

212.     Unless restrained by an Order of this Court, these violations may continue.

213.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

214.     Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

## CLAIM 9: Failure to Operate Storage Tanks in Accordance with Good Air Pollution Control Practices

215.     Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

216.     Vopak owns and operates storage vessels, including Tanks 403, 404, 405, 407, 408, 410, 411, 520, 601, 602, 606, 720, 721, and 918.

217.     Subject to a reasonable opportunity for further investigation and discovery, Tanks 720 and 721 are subject to NSPS, 40 C.F.R. Part 60, Subpart Ka, and Tanks 408, 410, 411, 520, 606, and 918 are subject to NSPS, 40 C.F.R. Part 60, Subpart Kb.  Because the tanks are subject to 40 C.F.R. Part 60, Subparts Ka and Kb, they are also subject to 40 C.F.R. Part 60, Subpart A. These eight tanks are all "Affected Facilities" under 40 C.F.R. Part 60, Subpart A.  Under 40 C.F.R. Part 60, Subpart A, § 60.11(d), the eight Affected Facilities referred to in this Paragraph must be maintained and operated "in a manner consistent with good air pollution control practice for minimizing air emissions."

218.     Subject to a reasonable opportunity for further investigation and discovery, all 14 Tanks referred to in Paragraph 216 above, are "Affected Facilities" subject to 40 C.F.R. Part 63, Subpart EEEE.  Because these 14 tanks are subject to 40 C.F.R. Part 63, Subpart EEEE, they are also subject to 40 C.F.R. Part 63, Subpart A.

219.     Under 40 C.F.R. Part 63, Subpart A, § 63.6(e)(1)(i), the 14 Affected Facilities referred to in Paragraph 216 must be operated and maintained "in a manner consistent with safety and good air pollution control practices for minimizing emissions."

220.     Under 30 TAC § 101.20(1), any person owning or operating a source of air contaminants must comply with any applicable new source performance standards promulgated by EPA pursuant to Section 111 of the CAA.

221.     During the October 2012 inspection, EPA inspectors used an infrared camera and a photo-ionization detector ("PID") to collect data that indicated that Tanks 408, 410, 411, 520, 606, 720, 721, and 918 were emitting a significant rate of VOCs, indicating that the tanks were

43

not being maintained and operated in a manner consistent with good air pollution control practice for minimizing emissions, as required by 40 C.F.R. § 60.11(d) and 30 TAC § 101.20(1).

222.    During the October 2012 inspection, EPA used an infrared camera and a PID to collect data that indicated that Tanks 403, 404, 405, 407, 408, 410, 411, 520, 601, 602, 606, 720, 721, and 918 were emitting a significant rate of VOCs, indicating that the tanks were not being maintained and operated in a manner consistent with safety and good air pollution control practices for minimizing emissions, pursuant to 40 C.F.R. § 63.6(e)(1)(i) and 30 TAC § 101.20(1).

223.    The above mentioned violations are also a violation of Vopak's Title V Permit O1068 (see Special Terms and Conditions, Nos. 7C and 12), and 30 TAC § 122.143.

224.    Unless restrained by an Order of this Court, these violations may continue.

225.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

226.    Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

### CLAIM 10: Failure to Minimize Excess MTBE Emissions from the P-Pit

227.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

228.     At all times relevant to this Complaint, Vopak's chemical storage terminal at the Facility was an Organic Liquids Distribution (Non-Gasoline) facility, subject to the NESHAP for such facilities codified at 40 C.F.R. Part 63, Subpart EEEE.  *See* 40 C.F.R. §§ 63.2330 through 63.2406.

229.     Texas incorporated the Organic Liquids Distribution (Non-Gasoline) Maximum Achievable Control Technology standard as specified in 40 C.F.R. Part 63, Subpart EEEE by reference. 30 TAC § 113.880.

230.     Under 30 TAC § 101.20(2), any person owning or operating a source of air contaminants must comply with any applicable emissions standards for hazardous air pollutants promulgated by EPA pursuant to Section 112 of the CAA.

231.     The chemical storage terminal includes trenches or "pits," designated by letter (e.g., "P-Pit"), that provide access to piping for maintenance and other activities.

232.     In October of 2012, EPA inspectors conducted an emissions survey at the Facility utilizing an infrared camera and a PID and detected elevated PID concentration readings downwind of the area designated as the P-Pit.  Vopak representatives explained that the pipeline previously contained MTBE and was being purged with nitrogen.

233.     MTBE exposure is associated with chronic and acute human health effects, and MTBE is flammable and listed as a HAP. 42 U.S.C. § 7412.

234.     Vopak violated 40 C.F.R. § 63.2378(b)(3) and 30 TAC § 101.20(2) by failing to minimize excess emissions by reasonably available measures and venting MTBE emissions at ground level in the P-Pit during shutdown activities.

235.     The above mentioned violations are also a violation of Vopak's Title V Permit O1068 (see Special Terms and Conditions, No. 1E), and 30 TAC § 122.143.

236.    Unless restrained by an Order of this Court, these violations may continue.

237.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Vopak is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4 and 82 Fed. Reg. 3633 (Jan. 12, 2017).

238.    Pursuant to Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Vopak is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

### CLAIM 11: Claim for Attorney's Fees to Texas

239.    Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

240.    Texas has expended and will expend through the course of litigation reasonable attorney's fees, court costs, and/or reasonable investigative costs.

241.    Pursuant to Section 7.108 of the Texas Water Code, Vopak is liable for Texas's reasonable attorney's fees, court costs, and reasonable investigative costs.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations in Paragraphs 1 through 241 of this Complaint, the United States and Texas respectfully request that this Court:

1.    Permanently enjoin Vopak from operating its waste treatment and disposal facility and its chemicals storage terminal located in Deer Park, Texas, except in accordance with the CAA, all applicable federal regulations, the Texas SIP, and all applicable permits;

2.      Order Vopak to apply for and comply with all applicable permits for the Deer Park Facility in accordance with the requirements of the Texas SIP and Title V of the CAA;

3.       Order Vopak to remedy its past violations by, among other things, requiring Defendants to install and operate the best available control technology at the WWTS;

4.      Order Vopak to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA and the Texas SIP alleged herein;

5.      Award the United States civil penalties of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and up to $95,284 per day for each violation occurring after November 2, 2015;

6.      Award the State of Texas civil penalties of not less than $50 nor greater than $25,000 per day for each violation;

7.      Award Texas its reasonable attorney's fees, court costs, and reasonable investigative costs for this suit;

8.      Award the United States their costs of this action; and

9.      Grant the United States and Texas such other relief as the Court deems just and proper.

Respectfully Submitted,

*Jeffrey H. Wood*

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

NICOLE VEILLEUX
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 616-8746
(202) 616-6584 (fax)
nicole.veilleux@usdoj.gov

ASIA A. MCNEIL-WOMACK
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0544

ABE MARTINEZ
Acting United States Attorney
Southern District of Texas

DANIEL HU
Assistant United States Attorney
Texas Bar No. 10131415
S.D. Tex. ID: 7959
1000 Louisiana St., Suite 2300
Houston, TX  77002
Telephone:  (713) 567-9000

OF COUNSEL:

ROBERT KLEPP
Attorney Adviser
Air Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
Washington, DC 20460

FOR THE STATE OF TEXAS:

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Division Chief, Environmental Protection Division

EKATERINA DEANGELO
Assistant Attorney General
State Bar No. 24087398
Ekaterina.DeAngelo@oag.texas.gov

JANE ATWOOD
Assistant Attorney General
State Bar No. 00796144
Jane.Atwood@oag.texas.gov

Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, TX 78711-2548
Telephone: 512-463-2012
Facsimile: 512-320-0911
ATTORNEYS FOR THE STATE OF TEXAS